ENOS STONE V. THEODORE DORSETT AND ANOTHER.

The County Court may deny letters of guardianship to a testamentary guardian ; but such power should be exercised with caution and delicacy, and only where it is expressly authorized, or is clearly implied ; as where there has been waste, embezzlement, &c. ; and not where the testamentary guardian has merely proceeded in good faith, to carry out the directions of the will, without having first qualified and given bond as required by the Statute.   (Hart. Dig. Art. 1572.)

Error from Galveston.   Tried below before the Hon. Nelson H. Munger.

The evidence on the trial in the District Court, in this case, was as follows :

J. G. Remick, for Stone, testified that he was the attorney and legal adviser of James Spillman, the decedent, for more than a year before his decease ; that about four days before his death, witness met decedent in the street on his way home from his place of business in Galveston ; walked along with decedent, who told him that in the event of his death he did not want Brown or his wife to have anything to do with his estate or his children, as Brown had cheated him about some wood matter ; that he and she were in the habit of calling each other cousins, but she was no relation of his. Some three days afterwards he sent for witness by Capt. Burgess, to do some writing for him, saying that he was very low and his doctor had advised him if he had any arrangements to make about his business, he had better attend to it. Witness accordingly went. Decedent requested witness to go after Dr. Stone (the appellant) and ask him and his wife to come immediately there, and in case he should die before they arrived,

Stone v. Dorsett.

he wished witness to tell Dr. Stone that he wanted him to take immediate possession of his house and negroes, and to send for his two children and bring them to the house; for him and his wife to select from his effects a bed and such other little things as they might need, and take them home to his house, and the balance to take immediately to the auction room and have them sold for what they would bring; rent out his house and hire out his negroes; and he wished it done immediately as there were " *hangers on* " about him, who would pilfer all they could after he was gone. He wanted Dr. Stone to take his trunk and keys, that he had not a dollar in the house, but he wished him to collect from Mr. Elkes the amount of his note in the trunk, about $100; also to get the account books from McCafferty (his partner) and collect some small balances due him on the books, and thus provide for the payment of his funeral expenses; that he wanted this done with as little expense as possible. Witness went to Dr. Stone and did the errand. About two hours afterwards witness returned to the house of decedent, and he stated to witness then that as he had not returned soon enough, he had got the writing done. On each of these occasions witness says he never saw the deceased in better possession of his reasoning faculties. He was in full possession and exercise of his mind as he ever was, and perfectly capable of attending to his business, as the witness verily believes. The next day after his burial, Dr. Stone came to witness for advice as to what course he should take with the house, negroes and other effects of the deceased, referred to above ; witness had before been Dr. Stone's legal counsel and adviser for some years. Witness then informed him of the request of decedent, and advised him to take possession of the house, negroes and effects, and pursue the course touching them that he, the decedent, had requested, and that when the will was probated, all would be right.

Sylvester and Burgess, witnesses to the will, confirmed Remick's testimony ; and Burgess testified further as follows :

Was intimately acquainted with Spillman for twenty years before his decease; that he boarded with him and was with him during his last illness, he being sick between three and four days before his death; that during his said last sickness, deponent was frequently with him; that during his sickness he, the said Spillman, appeared at all times rational, and that on the said 14th day of December, about 2 P. M., the deceased called witness to him, and requested witness, in the event of his death, to deliver the keys of his desk to Dr. Enos Stone. Witness then told him he would bring Dr. Enos Stone to him, and he could act for himself; and witness did go and bring Dr. Stone and his wife to the room of said Spillman, when he delivered the desk and the keys thereof to Dr. Stone; at which time he requested Dr. Stone to take charge of his children, to sell his perishable property, to rent out the house and hire out the negroes; he also requested Mrs. Stone to take charge of the youngest child, Charles, and to act the part of a mother toward said child; he also stated that he had no blood relations in the country, and that he had no confidence in his kindred by marriage. Witness had heard Mr. Spillman previous to this time, on several occasions, say that Mrs. Amanda Brown, the wife of Hiram Brown, (the present administratrix of the estate of James H. Spillman,) was no relation of his, and he did not wish his relatives to have anything to do with his estate; that Mr. Brown was a selfish man, and had deceived him in regard to some cordwood which he had put in his possession. During Mr. Spillman's last sickness, until the time witness carried Dr. and Mrs. Stone to the house of Mr. Spillman, witness never met with either of them at the house or in the room of Mr. Spillman. Witness boarded with Spillman at the time when witness carried Dr. and Mrs. Stone to the room of Mr. Spillman. After he had made known his wishes in regard to his children and the disposition of his effects and estate after his death, he requested Mrs. Stone to procure paper, pen and ink, and to write down what he wished; which she did, and in my

presence, witness holding the desk upon which she wrote, wrote down as he said Spillman dictated, what is contained in the said will before referred to ; and when it was so written down by Mrs. Stone, the said Spillman did sign the said writing, and at the time of signing, did declare the same to be his last will and testament, and requested deponent, Mrs. Stone and J. H. Sylvester to sign the same as witnesses thereto. And deponent further says that the said Spillman gave as one reason why he wished Dr. Stone to take charge of his children, that he did not wish them educated in the country and brought up where they might be exposed to and become cow thieves.

J. C. Massie, for Stone, testified as follows: Dr. Stone came to my house during my absence. On my arrival at home, the Doctor informed me that Spillman was dead, and had appointed him to take charge of his effects. Spillman had about seventy or seventy-five head of cattle that were upon the range which was in close juxtaposition to my place. Witness told the Doctor he should do something with them ; as he did not know them, they were liable to be preyed upon. He asked witness if he would buy. Witness declined. He left soon after and went to one of my neighbors. Upon his return he said he had ascertained the value of the stock from Mr. Bowles, and as he did not know it, and as it would be attended with expense in having them gathered, he would like witness would buy them, stating that if he sold he had no doubt the Court would ratify his acts under the circumstances. Witness purchased them. Witness thinks for $5 50, and offered the greater part payment ; but he said he was selling for the benefit of the heirs, and would rather take my note to draw interest after a specified time. The Doctor gave me a bill of sale for the cattle ; said when the facts were presented to the Court he had no doubt it would be ratified. The stock was left upon the prairie, under the supervision of the overseer, who witness knew received no compensation for taking care of it ; he kept

an eye over it, but gave it but little attention.    There was, previous to Spillman's death, a tolerable good stock of hogs ; they became missing very fast, and witness told Stone unless he did something with them, witness was satisfied he would lose all.    Witness succeeded in getting three head ; they were included in bill of sale and note, with the understanding if the witness got any more, witness was to account for them.    No others have, up to this time, been seen.    Witness thinks the cattle were exposed, especially without any regular stock-keeper, but not more so than witness has  known in other por-tions of the State.    Witness gave full value, and predicated it upon the judgment of experienced stock men.    Dr. Stone gave witness a bill of sale of all the stock Spillman had, and signed it as the executor of Spillman.

Stone introduced in evidence an instrument executed by Spillman, and acknowledged before a Notary Public, August 31st, 1854, purporting to be the last will and testament of said Spillman, but (in the language of the statement of facts) not executed in accordance with the provisions of the Statute.    It had no subscribing witnesses.    Its terms were similar to said Spillman's last will, except that it was fuller, and joined W. R. Baker with Stone, as executor and guardian.

On the other side was the following evidence:

Dr. Stanwood testified that he was the attending physician of the decedent during his last sickness ; that his disease was pneumonia, and that he was not in his right mind at any time after the attack, when he saw him.    The disease was likely to produce stupor resembling apoplexy ; that such was the con-dition of decedent; that he did not see him for several hours before he died ; that Dr. Herman Jeager was called as a con-sulting physician, and that he met him in the street, but not in the room of the patient.

George Frazier testified that he had been acquainted with the decedent for several years prior to his death ; that he and Mrs. Brown always called each other cousins ; that he always

expressed himself very friendly to her ; often stopped at her house, and she had once nursed and taken care of him when sick there ; that Brown and wife and Spillman were intimately friendly.

Capt. Falvel testified that he had been acquainted with Mr. Spillman since 1835 ; that he always called Mrs. Brown cousin ; was always friendly towards her and her husband. She stayed sometime at his, Spillman's, house when she first came to Texas with her husband, and that Spillman was often at their house, and when sick was nursed there, and they were on intimate terms of friendship ; called each other cousins, and Spillman's father said they were cousins.

McCafferty testified that he was partner in business with Spillman in Galveston; that Spillman and Brown and wife were always on most intimate terms, calling each other cousins.

Appellant admitted that he sold off the personal effects of deceased, and collected a note deceased held against Elkes for about one hundred dollars, before he made any application to the County Court or showing therein, and immediately after the death of Spillman.

Mr. Remick also stated that Spillman was intoxicated when he met him some four days before his death, and had the talk before mentioned ; and, on cross examination, said he did not advise Stone anything about the cattle he sold to Dr. Massie nor about the note referred to in the receipt copied herein and marked "A." The stock of cattle were the same mentioned in the receipt copied herein and marked "B." The execution of both of said receipts was proved by said Remick.

Exhibit A was an order dated January 5th, 1855, from Stone to George Frazier to deliver to Messrs. Palmer & Jordon, "a note due to J. H. Spillman, deceased, by Mrs. Sarah "A. Ritton or Hardin, which was placed in your hands during "his life time, of whose estate I am executor." Exhibit B was as follows : Harris county, January 4th, 1855. Received of

J. C. Massie, his obligation for five hundred and thirty dollars, for which I have sold him the stock of cattle and horses belonging to the estate of J. H. Spillman, deceased, and the brand of said Spillman.           E. STONE,

Executor of J. H. Spillman.

Then followed a copy of the decree of the Probate Court, admitting the will to probate, but refusing letters of administration to Stone, and issuing same to Amanda D. Brown. It was admitted that Theodore Dorsett, who was appointed guardian of the younger child of the decedent, was the grandfather of said child, and that the mother of said child, late wife of said decedent, died before her husband. The case of Stone v. Brown will be found reported in 16 Tex. R. 425, and the statement of facts in that case and this was the same.

*Allen & Hale,* and *R. H. Howard,* for appellant.

*H. N. & M. M. Potter,* for appellee.

HEMPHILL, CH. J. On or about the 14th December, 1854, James H. Spillman departed this life, having, a short time previous to his death, executed his last will and testament, to the effect as follows : I want my children brought to Galveston ; Dr. Stone to take charge of them as guardian for them ; sell the perishable property ; rent out the house ; hire out the negroes, &c ; my son Charles I want Mrs. Stone to take charge of, and keep him with her until he is old enough to put to school as a child of her own.

(Signed,)           J. H. SPILLMAN.

Attest : JOHN BURGESS,
      J. H. SXLVESTER,
      SARAH A. STONE.

December 14th, 1854.

In January, 1855, Dr. Stone filed in the County Court his

petition, praying that the will should be admitted to probate, and that letters of administration, with the will annexed, might be granted to him. At the same time he filed an application for letters of guardianship over the minors, John B. and Charles N. Spillman, claiming such guardianship by virtue of the devises in the will of their deceased father. Notice was given, as the law directs, in both cases. The application of Stone was opposed, as well in the case which claimed probate of the will and letters testamentary, (or, as it is styled in the proceedings, letters of administration with the will annexed,) as in the application for letters of guardianship. At the February Term, 1855, of the County Court, judgment was given in both causes ; on the first, establishing the paper as a will, and admitting it to probate and record, but refusing to recognize Stone as executor under the will, or grant him letters of administration with the will annexed, but granting the same to Amanda D. Brown, having first revoked letters of administration which had been issued to the said Amanda at the previous or January Term of the County Court. In the second cause, judgment was given against Stone, refusing the prayer of his petition for letters of guardianship. The judgments in both of these causes were afterwards, in June, 1855, on appeal, affirmed in the District Court. From these judgments there were appeals to the Supreme Court, but, unfortunately, the transcript in but one of them was filed at the last Term, viz : the transcript of the record and judgment in the cause which, though it established the will, yet refused its administration to Stone, and this has involved the necessity of bringing up now, on the part of Stone, by writ of error, this judgment refusing letters of guardianship to the said Stone.

The first cause, brought up at the last Term of this Court, was decided at that Term, and a glance at the Opinion then pronounced, will show that the only question involved, or now insisted upon, in this record, was then, in effect, considered and definitively adjudged. The judgment in the case now in

hand shows, by its recitals, that the ground of objection to Stone, and on which the court rested its decision, was that he had disqualified himself by improper interference and intermeddling with the estate and property of the minors ; or, in other words, that he had intermeddled with the property prior to the issue of letters of guardianship. Now, one of the grounds of objection to the grant of administration with the will annexed, to Stone, was that he was disqualified by his intermeddling with the estate, to be such administrator. And in the plea in which this is set up in the first cause, it is added by the parties in opposition, that they object to said Stone being appointed guardian because he has disqualified himself as such guardian by acts of intermeddling with the estate. In fact the grounds of objection in both suits were substantially the same, viz : That the paper offered by Stone was no will, and if it were, that Dr. Stone had, by his intermeddling, disqualified himself for receiving either the appointment of administrator or guardian. The paper offered by Stone was established as a will in all the Courts ; and by the Supreme Court, in substance, it was held in the former case, that the acts done by Stone, under the circumstances, viz : the unlimited confidence of the testator, the delivery of the keys to Stone, the request to take immediate possession of the house and effects of the deceased, at his death, did not amount to such intermeddling with the estate as should disqualify him from receiving letters testamentary ; and the judgment of the County and District Courts, refusing such letters, were declared erroneous and were reversed.

If the intermeddling was not of such character as to disqualify Stone for the appointment of administrator, or rather from receiving letters testamentary, certainly they could operate to no such disqualification as to exclude him from being appointed as guardian. It must be recollected that Stone does not derive his authority to administer the estate or act as guardian for the minors, solely from the grant of power by the

County Court. He derives his authority, both as executor and as guardian, from the will of the deceased. The only default chargeable to Stone is, that he attempted to perform some of the acts enjoined upon him by the will, without first applying for letters testamentary, giving bond, &c. For if he had received such grant, (and we have decided that he was entitled to it by law,) he would have required no order of the County Court to enable him to collect the one hundred dollar debt due the estate, or to have sold the cattle, horses or hogs. These, under the circumstances, might justly be regarded as perishable property, and as such he was authorised to sell them by the express directions of the will. (Hart. Dig. Art. 1173.) The language of the will is earnest and emphatic. The injunction is positive, that the perishable property shall be sold. The facts in evidence show that such was the wish of the testator, and they also show that the only injury suffered by the estate was from the fact that the sale was not made at an earlier day. The sale was in about three weeks after the death of the testator, and even then but three of a " tolerable good stock of hogs" could be found.

Dr. Stone had been advised by his legal counsel to take possession of the effects, and pursue the course touching them, requested by the deceased, and that when the will would be probated all would be right ; and when he sold the cattle he informed the purchaser that he had no doubt the Court, when informed of the facts, would ratify the sale. It does not appear from the evidence, that Stone intended to embezzle the property, or to act in contempt and defiance of the authority of the Court, but only to make such disposition, in conformity with the directions of the will, as would be most beneficial to the estate. And if the act of sale was really conservative, if the estate would have suffered loss, had the sale not then been made, certainly the sale was no ground on which letters testamentary could have been refused, and especially when it is considered that, where a sale is directed by will, no

order from the County Court is necessary, to make such sale. It is admitted that an executor must give bond with security, unless otherwise directed by the testator, (Hart. Dig. Art. 1130,) and where he performs acts prior to the issuance of the letters testamentary, they should be closely scrutinized ; but they must be clearly acts of malfeasance, before they can operate to defeat the wishes of the deceased, to exclude him who has been nominated by the testator, with the hope and confiding trust, that he would carry into effect the solemn behests of his last will, and to confer this office upon a stranger, and one perhaps who was distrusted by the deceased.

Had there been no will, had the power of administration on the estate been derived solely from the Probate Court, it is believed that the mere fact of intermeddling with the estate, before the grant of administration would not, of itself, be sufficient ground for the refusal of letters to a person otherwise entitled. At least a grant, if made, could not be objected to on the ground that the administrator had been acting previously as executor in his own wrong. (1 Williams on Ex'ors. 221 ; 15 Mass. 322, 325 ; 8 Johns. 126.)

But it may be said that though intermeddling with an estate is not good ground for refusing letters testamentary to an executor, yet the rule does not hold as to letters to testamentary guardians, who are in effect prohibited from interfering with the estate of the minors until they qualify and receive letters of guardianship. (Hart. Dig. Art. 1572.) What is the intention of this provision, requiring bond and security from a testamentary guardian ? Clearly for the benefit of the minor, and to supply a defect in the provisions of the Statute of Charles the Second, which first introduced testamentary guardians in the Common Law system, who, under that Statute, were not required to give bond and security as a condition precedent to their assumption of guardianship. There is no penalty attached to the interference, and certainly the Court is not, by construction, authorized to attach a consequence which would

defeat the whole object of the Statute ; and that is, to author-. ize a father, by will, to appoint a guardian for his children.

The painful, earnest solicitude of the father, in this case, that Stone should be the guardian of his children, impresses itself strongly upon the mind, as well from the terms of the will itself, as by his wishes expressed to persons around him in his last illness. It appears also from an informal will executed some months previous to that time. Can these wishes, these injunctions be disregarded by a Court, simply because this guardian, this second parent, to whom was given the control of the property, the education, and, in a great measure, of the morals and habits of these children, did not, before entering on the discharge of his duties, comply with all the formalities requisite to give sanction and legal power to his appointment ? The policy of the law authorizing fathers to appoint guardians for their children, the solemn trust bequeathed by the decedent to his surviving friend, forbid a construction which would defeat such policy, and render vain and ineffectual the hopes and the deliberate final choice of a father in his last illness. A testamentary guardian does not receive the appointment for his own benefit, but for that of the minor. If, like the guardian in chivalry, he received the profits of the estate for his own use, there would be some reason for his removal for slight defaults. But not so where the appointment is for the benefit of the minor, and where the object most cherished by the father, in making such appointment, may be defeated by his removal, or by refusal to issue him the necessary letters. This power, although operating to defeat the appointment, may be exercised by the Court in proper cases, but with caution and delicacy, and only where it is expressly authorized, or clearly and plainly implied, as where there has been waste, embezzlement, &c.

The intermeddling acts, as they are called, of Stone, ought not, on another ground, to be set up against the grant of the guardianship. Under the will he is both executor and guard-

ian. He holds the property more properly in his capacity as executor, until the estate is settled, than in that of guardian ; and if his interference was not sufficient to defeat his right to the letters testamentary, certainly it cannot be set up against the guardianship, which, as to the estate, does not go into active operation until after the property has been received and administered by the executor. At least, the estate of the guardian is subordinate to that of the executor, and an act of intermeddling, which will not prevent the enjoyment of the latter, cannot be allowed to dfeeat the former.

We believe there was error in the decree of the County Court, which overruled the application of Enos Stone, for letters of guardianship of the persons and estates of the minors, John B. Spillman and Charles N. Spillman, the children of the testator, James H. Spillman ; and that there was error in the judgment of the District Court, which affirmed the judgment of the County Court ; and both judgments are reversed, and this cause is remanded to the District Court, with instructions to enter a judgment sustaining the application of the said Enos Stone for letters of guardianship over the persons and estate of the said minors, in conformity with the opinion of this Court, and to certify the said judgment to the County Court for the observance of that Court.

Reversed and remanded.