No. 2109.

BEN KIRBY *v*. THE STATE.

1. DEPOSITIONS—PRACTICE.—Certificates given in identifying as authentic depositions or testimony taken at coroner's inquests or examining trials are not necessary or even proper matters to be incorporated in a statement of facts.   If questions arise as to whether such testimony was properly authenticated, the better practice is to have the exception to it show what the authentication was, or, as was done in this case, the trial judge can make it appear in his explanation of the bill of  exceptions. See the opinion for a justice's certificate to a deposition *held* to be sufficient to authenticate it.

2. SAME—CONFESSIONS.—The Code of Procedure, Article 774, places testimony taken at an inquest in the same category as testimony taken at an

examining trial, and the same rules govern the admissibility of both; where-
fore the confession of a prisoner to a coroner's inquest is competent evidence
agianst him if, as provided in Article 750, it was made in his voluntary state-
ment taken in accordance with law, or was made voluntarily after having
been cautioned that it could be used against him, etc.  Articles 261 and 262
prescribe the mode of taking and authenticating such a voluntary state-
ment "in accordance with law," and require that it be made before any
witness be examined, and be signed but not sworn to by the accused.

3. SAME.—Appellant being on trial for the murder of his jailer, the State
was allowed, over objection, to put in evidence his statement to the cor-
oner's inquest, which statement, as shown by the magistrate's certificate,
was made after due caution that it could be used against him.  It does
not appear that he was in arrest or under accusation when he made the
statement, but it is inferred that he was then suspected by the magistrate,
and was therefore cautioned, though treated as a witness and sworn to
his statement.  *Held*, that the statement is not "a confession made in
the voluntary statement of the accused," and its admissibility depends
upon whether it was "made voluntarily after having been first cautioned
that it may be used against him."

4. SAME—"CAUTION."—The Code of Procedure prescribes no form in which
must be given the "caution" that a voluntary statement may be used in
evidence against the maker.  The caution is sufficient if the maker of
the statement be warned that so much of it as is inculpatory of himself
may be used against him.  His silence or refusal to testify could not be
used against him as a confession.

5. SAME—"VOLUNTARY."—In view of the ample caution given appellant in
this case, and of his subsequent declaration that he was willing to tell all
he knew in regard to the killing, and of his signing and swearing to his
statement, the statement must be regarded as clearly a "voluntary state-
ment"; and the trial court committed no error in admitting it as evidence
for the State.

6. MURDER—PRINCIPAL OFFENDERS—CASE STATED.—Appellant and two
other prisoners conspired to escape from jail, and arranged that C., who
was one of them, should secure and detain the jailer in the corridor
while the escape should be effected.  No understanding to kill or injure
the jailer, otherwise than by his detention, was expressly proved, but the
conspirators had obtained and prepared a piece of iron with which the
jailer was killed by C., and it had been concealed by the appellant the
morning previous to the homicide.  C. killed the jailer in the corridor of
the jail, and whilst the appellant and the other prisoner were locked up
in their cell and thus disabled from assisting C. in the homicide.  There
was no proof that appellant by word or gesture encouraged C. to kill the
jailer.  *Held* that on this state of case the question arises whether the
appellant was a principal in the homicide, and the test of that question
is whether he and C. acted together, and whether the act was done in
pursuance of a common design and purpose wherein their minds had
agreed.

7. SAME.—It is contended for appellant that the conspiracy extended no fur-
ther than the escape, and did not contemplate the killing of the jailer,

or the infliction of bodily injury upon him beyond his mere detention, and that the killing was the individual and independent act of C. alone, perpetrated without appellant's knowledge or complicity, and without ability on his part to prevent it. But *held*, in view of the nature and object of the conspiracy, and of the preparation and use of a deadly weapon as a means to execute the common design, that the homicide was not the independent act of C. alone, but was the act of each and all the conspirators, because it was directly incident to and grew out of the common design of all. See the opinion *in extenso* on the amenability of co-conspirators for the acts of each other done in the execution of an unlawful thing.

APPEAL from the District Court of Jones. Tried below before the Hon. J. V. Cockrell.

The indictment in this case charged that the appellant, on August 31, 1886, did, of his malice aforethought, kill William Glazner, by striking and beating him with a bar of iron. The jury found him guilty of murder in the second degree, and awarded him a term of twenty-three years in the penitentiary.

Doctors Andrews and Hollis, for the State, testified that they were physicians and surgeons, and, on the night of August 31, 1886, examined W. Glazner within a few minutes after he received the blows which resulted in his death a few days later. There were five or six wounds on his head. The skull was broken in two or three places, one on each side of his head, and one at the back of his head near the base of the skull. These wounds were necessarily fatal and produced his death. They seemed to have been inflicted with the sharp edge of some hard instrument. The witnesses saw a bar of iron in the cell. It was a foot in length, two inches wide, half an inch thick, weighed three pounds less one ounce, and was shaped ſ. A bar of iron being handed the witnesses, they recognized it as the one they saw in the jail. It was very bloody, and was wrapped with a towel very tight and tied with a string. The iron was wrapped its full length in the towel, and a considerable part of the towel hung loose at the small end of the iron, making a good handle if the iron was used as a bludgeon. Thus wrapped, the iron was a deadly weapon in the hands of a man of ordinary strength, if used as a bludgeon. Appellant and Joe Brown were locked up in the cage in the south end of the jail, when the witnesses went there on the night of August 31, 1886. Glazner, after receiving the wounds, was never able to communicate with any

one.   The wounds were inflicted in Jones county, Texas, and he died there some days later.

W. H. Smith, for the State, testified that about eight or nine o'clock p. m. of August 31, 1886, he was at the Star Hotel, about sixty-five yards north and a little east of the court house of Jones county.   The jail was in the northwest corner of the court house.   About the hour stated, the witness heard loud cries in the jail, and thought they were those of Glazner, whose voice he knew well.   The cries were in tones of distress, as the witness thought, and said "help, boys, help."   When the cries were heard the witness, with Morgan Rhoads and others, ran to the jail and looked in at the northeast window.   Witness saw some one in night clothes stooping over another person in the corridor of the jail.   Witness took the latter person to be William Glazner.   He was prostrate, and the person in night clothes was striking him with something, and said "boys, I have done him up."   This last voice was not recognized by witness.   Other talk inside the jail was spoken in an ordinary tone of voice, but the witness could not understand what was said.   Witness heard no one besides the deceased halloo or give alarm.   Witness ran to get arms and help, and heard window glass breaking.   Upon entering the jail it was discovered that Cannon was gone. Appellant and Joe Brown were in the south cell of the jail, and Glazner was lying on the floor in the corridor of the jail, and was very bloody, senseless, groaning and uttering unintelligible talk.   The corridor door of the jail was open.

Wiley M. Smith, for the State, testified that he heard the cries of distress in the jail about eight or nine o'clock p. m. of August 31, 1886, and thought he recognized the voice of William Glazner calling for help.   The witness and several other persons ran to the northeast window of the jail, where they could look in.   He saw some one prostrate in the corridor of the jail, and another person over him.   Witness saw the latter strike the former one blow, and heard something said about "boys," but could not tell by whom it was said.   Witness saw the man who struck the blows stoop down and feel over the breast and person of the prostrate man as if searching for something.   He heard something said about killing, but could not tell what it was nor by whom spoken.   All he heard from the deceased was his cries and groans.

Morgan Rhoads was the next witness for the State.   On hearing the cries at the jail he and others ran over there, and just as

he got there he heard some one say "don't shoot him," and something about "kill him," but witness could not get the sense of what was said. Witness, however, was certain he heard the words "don't shoot" and the word "kill," but did not know by whom they were spoken. He went off to arm himself, and then, returning, he went to the northwest corner of the court house, when he heard some glass break and saw some one run away from the southwest corner of the jail, dressed in white or night clothes and barefooted. The jail being entered, the defendant and Joe Brown, in their night clothes, were found locked up in the south cell of the jail.

H. A. McEachin was the next witness for the State. His testimony was in accord with that of the previous witnesses. He took possession of the bar of iron and the towel it was wrapped in, and kept them until he delivered them to Sheriff Scarborough. There were cuts through the towel where it was wrapped around the sharp edges of the large end of the iron.

G. A. Scarborough, sheriff of Jones county, testified, for the State, that he was absent from the county seat at the time of the tragedy. He had left the jail and its three prisoners, Cannon, Brown and the appellant, in the charge of Glazner, the deceased. When witness returned, Cannon was gone and appellant and Brown were still in jail. It was the custom at the jail to unlock the doors to the cells in the daytime, so that the prisoners could take exercise in the corridor.

The State closed by introducing the testimony of appellant before the coroner's inquest. This testimony is set out in full in the opinion of this court. No evidence was introduced by the defense.

*Cockrell & Cockrell,* for the appellant.

*J. H. Burts,* Assistant Attorney General,.for the State.

White, Presiding Judge. Whilst, by the indictment, appellant was charged directly with the murder of William Glazner, it is made to appear by the proofs that the wounds which caused the death were inflicted by the hand of one Add. Cannon alone, and that appellant's guilt, if at all guilty, depended upon the existence at the time of a conspiracy between Cannon, one Brown and appellant, to effect their escape from the jail of Jones county, in which they were all confined—Cannon's act

being claimed to be in furtherance of said conspiracy. In many of its features the case is quite similar to that of Waite v. The State, 13 Texas Court of Appeals, 160.

At the time Cannon inflicted the fatal blows upon Glazner, those two parties were in the corridor of the jail, while Brown and this appellant were locked in one of the iron cages or cells, from which, though they could hear and partly see what was going on, they could not actually assist in the bloody work. After its accomplishment, Cannon made his escape from the jail, leaving appellant and Brown still securely locked within their cage, where they were found by parties who had been alarmed by the noise made by, and who came to the rescue of, Glazner.

A coroner's inquest was held upon the dead body of Glazner, at which both Brown and this appellant testified as witnesses. (Under art. 998, Code Crim. Proc.) Appellant's testimony, as taken in writing by the coroner, being in the following words, viz.:

"My name is Ben Kirby. I have been in jail about five months at Anson, Jones county, Texas. I knew Add. Cannon; have been in jail with him for about a month. The only place I knew Add. Cannon was in jail, both at this place and at Colorado City, Mitchell county, Texas. I was confined in jail in Anson, August 31, when Cannon killed Mr. Glazner. I had a conversation with Cannon before he killed Glazner. Cannon was to stay back of the door in the other cage, and when Glazner came into the cage Cannon was to come in behind and close Glazner in the cage or inside the corridor. This agreement was made between all three of us—Cannon, Brown and myself. A bar of iron was exhibited, and witness said the bar of iron was taken off from the cage on the twenty-eighth or twenty-ninth of August. The bar belonged to the water box in the jail. I heard some blows, but did not see who struck the blows. I could not see, out of my cage, only part of the scuffle between Cannon and Glazner. I saw the last blow struck by Cannon on Glazner. Cannon was striking him over the head with something; I could not see what it was. At the time Glazner was down and Cannon over him, I called to Cannon not to murder the man, or something of the kind. He told us to 'shut up, you damned fools.' I never heard him say anything to Glazner. Cannon ran out and tried to get out at the door; then came back and pointed his pistol he had taken from Glazner at Glazner's head, and told him to give up the

keys. I told him not to murder the man, that he was already killed, but to go out and get away. He then went out and around the cage, I thought, and this was the last I saw of him. [Witness said he placed the bar of iron here exhibited under the water closet, the morning of the difficulty, and placed some water paper around it, so it could not be seen.] This piece of iron was the one that Cannon was striking Glazner with. I saw him strike, I think, the three last blows with it. He struck Glazner over the side or back of the head. Glazner had no hat on when I saw Cannon striking him. The piece of iron exhibited was covered with a towel and had fresh blood on it, and lay just in front of our cage where Cannon was beating Glazner. This is why I say it is the same piece that Cannon was beating Glazner with.

   " [Signed].                                    BEN E. KIRBY."

   To this testimony, as shown by the judge's explanation to the bill of exception relating thereto, the coroner has attached the following certificate, viz: "The State of Texas, County of Jones: I, Samuel P. Ford, justice of the peace in and for Jones County, Texas, do hereby certify that before any testimony was given at the inquest held over the body of W. M. C. Glazner, deceased, by the witnesses, Ben Kirby and Joe Brown, that, as justice of the peace holding said inquest, I informed said witnesses that if they had taken part or were in any manner connected with the killing of W. M. C. Glazner, that they need not make any statement connecting themselves with said killing, and that if they did make said statement showing that they took part in said killing, that the same could be used against them. That said Ben Kirby and Joe Brown both said they were willing to tell all they knew in regard to (the) killing of Glazner on the night of August 31, 1886, at Anson, Jones county, Texas, and that the foregoing pages containing their testimony was given and taken down, signed and sworn to by them, after they had been warned as before stated.

   "[Signed]                                   SAMUEL P. FORD,
                             J. P. Pre. No. 1, Jones Co., Texas."

   At the trial below, when the prosecution offered this statement of defendant as thus taken and certified at the coroner's inquest in evidence, defendant's counsel objected to its introduction, because at the time it was made defendant was in cus-

tody, because it was not voluntary, and because it was not voluntarily made after the party had first been properly warned that it might be used against him.   And the testimony is further complained of in appellant's brief, because, as set out in the statement of facts, it is not, as required by law, identified and authenticated by the justice or coroner, and that the addenda of the judge to the bill of exceptions, setting forth as it does the justice's certificate, does not cure the defect apparent in the statement of facts.

Noticing this last objection first, we reply that the very question suggested was decided in the opinion on rehearing in Ballinger v. The State, 11 Texas Court of Appeals, pages 335–336, where it was held that certificates given in the identification as authentic of depositions or testimony taken on examining trials are not necessary or even proper matters to be incorporated into the statement of facts.   Where, however, questions arise as to whether such testimony was properly authenticated, then, in explaining the exception taken to the ruling, it is the better practice to have the exception show what the authentication was, and in case it does not do so it is eminently proper that the trial judge should make it appear, as was done in this instance, in his explanation to the bill.   As stated in the explanation, the testimony is shown to have been sufficiently authenticated by the certificate of the justice who held the inquest.   (O'Connell v. The State, 10 Texas Ct. App., 567 ; Evans v. The State, 13 Texas Ct. App., 225 ; Kerry v. The State, 17 Texas Ct. App., 179 ; Timbrook v. The State, 18 Texas Ct. App., 1.)

Let us now notice the other objections.   It is insisted that a sufficient predicate was not laid under the statute regulating the circumstances under which statements made by parties whilst under arrest may be used against them.   We will premise by stating that the admissibility as evidence of testimony taken at an inquest stands in the same category and is governed by the same rules as is testimony taken at an examining trial.   (Code Crim. Proc., art. 774.)   With regard to voluntary confessions the language of the statute is:   "The confession shall not be used if at the time it was made the defendant was in jail or other place of confinement, nor while he is in custody of an officer, *unless such confession be made in the voluntary statement of the accused taken before an examining court in accordance with law,* or be

made voluntarily after having been first cautioned that it may be used against him," etc.   (Code Crim. Proc., art. 750.)

The procedure, with regard to a voluntary statement of a defendant at an examining trial before a magistrate, is prescribed by Articles 261 and 262 of the Code of Criminal Procedure, in which articles it is provided that, "Before the examination of the witnesses the magistrate shall inform the defendant that it is his right to make a statement relative to the accusation brought against him; but shall, at the same time, also inform him that he can not be compelled to make any statement whatever, and that, if he does make such statement, it may be used in evidence against him."   And, "if the accused shall desire to make a voluntary statement he may do so before the examination of the witnesses, but not afterward.   His statement shall be reduced to writing by the magistrate or some one under his direction, or by the accused or his counsel, and shall be signed by the accused, but shall not be sworn to by him," etc.   It will be noticed that a voluntary statement, made at an examining trial is made after the defendant is warned and cautioned. Hence a confession thus made is *per se* legitimate evidence. (Code Crim. Proc., art. 750).   How the testimony of witnesses at an examining trial, is taken, reduced to writing, signed and certified, is provided in Articles 265, 266 and 267, Code of Criminal Procedure, and as to coroner's inquests, in Article 998, Code of Criminal Procedure.

At the time of the inquest it may be that appellant was suspected of complicity in the homicide, and, from the warning given by the coroner, we infer that such was the case.   Still, it is not made to appear that, though in custody, he was either under arrest for the murder or had at that time been charged in any manner with it.   It may be the coroner considered him as a defendant implicated in the murder, and intended to inform and caution him with regard to his statement in the manner pointed out in Article 261, supra; but a literal construction of the language used in the caution given does not make it conform precisely to the terms of that Article, and, moreover, he had the party to sign and swear to the statement made, which is contrary to the instructions of Article 262.   We think a fair and legitimate construction to be placed upon the whole matter is that, whilst the coroner suspected the party, he treated him with regard to his statements only as a witness—but a witness to whom suspicion attached, and on account of which it would

be well to guard him against the consequences of any statement
he might make. He says: "I informed said witnesses that if
they had taken any part, or were in any manner connected
with the killing of W. M. C. Glazner, they need not make any
statement connecting themselves with said killing, and that if
they did make said statement showing that they took part in
said killing that the same could be used against them. That
said Ben Kirby and Joe Brown both said they were willing to
tell all they knew in regard to (the) killing of Glazner."

As made, the statement, being the testimony of a witness taken
at a coroner's inquest and under the circumstances shown,
could not with propriety, we think, be said to be a "confession
made in the voluntary statement of the accused, taken before
an examining court in accordance with law." (Art. 750). If
admissible then, its admission must rest solely upon the other
ground of the statute, viz., that the confession was "made vol-
untarily, after having been first cautioned that it may be used
against him." (Id).

Two questions are to be determined in the solution of the
matter: Was the caution sufficient? and, was the statement
voluntary? No form of caution is prescribed by Article 750; all
that is required is that the party be cautioned that it may be
used against him. What used against him? His confession,
of course; not his statement of indifferent matters, which,
though admissible also, did not concern perhaps, or at all events
*which could not be used against him.* As to such matters it
makes no difference, so far as he is concerned, whether he is
cautioned or not. But it is his confession of guilt as to the fact
charged, or his admission of facts which inculpate him with it,
*that may be used against him,* and it is as to these he must have
been warned or cautioned before they can be *used against him,*
if, at the time they were made, he was in custody or under
arrest. If he did not confess complicity in the crime, then there
would be nothing stated by him which could be *used against
him.*

In the case before us, the coroner warned him only as to mat-
ters implicating or connecting him with the murder, and these
surely were the only matters which might be used against him
afterward in connection with the murder. We can not well im-
agine a stronger or more pointed one than the caution here
given. It certainly is in substantial compliance with the spirit,
intent and meaning of Article 750, as we understand and con-

strue the language used. Counsel for appellant contend, as a further objection to it, that "under the warning, he had to make a statement or by his silence confess his guilt."

We do not think so; and, besides, had he remained silent and refused to testify, such act or conduct could not be proven against him as a confession. (In point see People v. Willett, 92 N. Y., 29.)

Was the evidence voluntary? We must so conclude, after such a warning, and in the light of the subsequent declaration made by the parties that "they were willing to tell all they knew in regard to the killing," and the further fact that they were solemnly sworn and testified, and signed their testimony after it was reduced to writing. It occurs to us that, if ever there was a statement voluntarily and deliberately made, we have it in the testimony of these witnesses at the coroner's inquest held upon the dead body of Glazner. There was no error in the court's holding the evidence admissible.

According to this statement or evidence it is clear that the parties had entered into an agreement and plan by which to effect their escape from jail, a part of which was as to the method by which Cannon was to secure and detain Glazner in the corridor. It is true that appellant says nothing about an understanding that Glazner was to be killed, or even that any bodily injury was to be inflicted upon him further than his confinement or imprisonment after he had entered the jail; but, as part of the plan, and doubtless, as considered by them, a most important part, they had procured and prepared for use the piece of iron with which the murder was committed, and appellant tells us that he himself, after it was prepared, hid the same under the water closet on the morning before it was used with such deadly effect by Cannon. If not to be used in any contingency, why prepare and hide such a weapon? Here we have established by the statement the conspiracy to effect the escape, and the preparation of a deadly instrument to be used, it may be, only if occasion required. True that at the very time it was used appellant and Brown were so situated that it was impossible they could afford Cannon any direct assistance, or, in fact, do more, perhaps, than encourage him by words and gestures, even if they did so encourage him, of which fact there is no positive proof.

Under such circumstances, and without direct proof of encouragement, the question is, could appellant be held and considered in law a principal in the crime committed by Cannon?

It is declared that "all are principals who are guilty of acting together in the commission of an offense" (Penal Code, art. 74), and "all persons who shall engage in procuring aid, arms or means of any kind to assist in the commission of an offense whilst others are executing an unlawful act," are principals. (Penal Code, art. 76.) And again, any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act. (Penal Code, art. 78.)

Thus it will be seen that, to render a party equally guilty and responsible with the real perpetrator, all that is required is that he be present, consenting, and that the act was the result of a common design. It is true his bare presence is not sufficient, nor is his failure to give alarm; neither is his inactive and supposed concealment of the offense. (Burrell v. The State, 18 Texas, 711; Truitt v. The State, 8 Texas Ct. App., 148; Tullis v. The State, 41 Texas, 598; Ring v. The State, 42 Texas, 282.) But such significant facts as his presence in connection with his companionship, his conduct at, before and after the commission of the act, are potent circumstances from which participancy may be inferred. (Id.) The true test is, did the parties act together, and was the act done in pursuance of a common design and purpose in which their minds had agreed? (Welsh v. The State, 3 Texas Ct. App., 413; Wells v. The State, 4 Texas Ct. App., 20; Scales v. The State, 7 Texas Ct. App., 361; Corn v. The State, 41 Texas, 301; Smith v. The State, 21 Texas Ct. App., 107.)

There can be no question as to the common design and conspiracy to effect an escape from jail, and the fact is also incontestible that the murder was committed by Cannon in pursuance of this common purpose. But, while this is so, it is insisted that the conspiracy only extended to a purpose to confine Glazner in order that the escape might be accomplished—that the evidence fails to show that appellant and Brown ever contemplated, much less agreed to, his murder or the infliction of any bodily harm upon him, and that the fatal blows dealt him by Cannon causing death were the result of an independent act upon the part of Cannon without their knowledge or concurrence, and without the ability on their part even to prevent it.

" The joint responsibility of parties for each other's misconduct rests on the principle that when an act is committed by a body of men engaged in a common purpose, such act is treated

as if specifically committed by each individual. It should be observed, however, that while parties are responsible for collateral acts growing out of the general design, they are not responsible for independent acts growing out of the particular malice of individuals. Thus, if one party of his own head turn aside to commit a felony foreign to the original design, his companions do not participate in his guilt." (Whart. on Hom., secs. 201, 202; Mercersmith v. The State, 8 Texas Ct. App., 211; Stevenson v. The State, 17 Texas Ct. App., 619.) But it is equally as well settled that "all combining to commit an offense to which homicide is incident are principals in homicide. As where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and in the execution of their design a murder is committed, all of the company are equally principals in the murder, though at the time of the fact some of them were at such a distance as to be out of view, if the murder be in the furtherance of the common design. * * * * * * Malice in such a killing may be inferred as a presumption of fact *from the nature of the design and the character of the preparation;* whether the deceased fell by the hand of the accused or otherwise is immaterial. * * * It is only where the causes leading to the homicide have no connection with the common object that the responsibility for such homicide attaches alone to its actual perpetrator." (Whart. on Hom., sec. 338.)

As stated, we have in the evidence before us a common design to escape from jail, preparations to effect that purpose, a deadly weapon prepared as a means to be used if necessary in the accomplishment of the common purpose, the use of the deadly weapon by one of the parties in endeavoring to carry out the common design. Such a homicide, committed under such circumstances, is not a collateral, independent act of the actual perpetrator, but is the act of all, because it was an act directly incident to and growing out of the common design of all.

If, as is clearly proven, part of the common design was to imprison Glazner within the jail, and detain him therein without his consent until the parties had effected their escape, then such detention would be unlawful and constitute what in our code is denominated "false imprisonment" (Penal Code, art. 513), for which they would be liable to punishment by a fine not exceeding five hundred dollars and confinement in the county jail not exceeding one year. (Id., art. 518.) Mr. Bishop says "a

man may be guilty of a wrong which he did not specifically intend, if it came naturally or even accidentally from some other specific or general evil purpose. When, therefore, persons combine to do an *unlawful thing*, if the act of one proceeding, according to the common plan, terminates in a criminal result, though not the particular result meant, are all liable." (1 Bish. Crim. L., 7 ed., sec. 636.)

In Mercersmith's case, 8 Texas Court of Appeals, supra, it was said where two persons go out for the common purpose of robbing a third person, and one of them in pursuit of such common purpose kill such third person under such circumstances as to make it murder in him who does the act, then it is murder in the other. * * Nor is it necessary that a common guilty purpose of resisting to the death any person who should endeavor to apprehend them must have been formed when the parties went out with the common design of committing the unlawful act, to render all principals in a murder by one of them whilst making such resistance."

The law applicable to all the various phases in which the evidence should be considered by the jury was submitted by the court in a charge which, while not free from liability to criticism on account of awkwardness of expression in some instances, is yet believed to be sufficiently clear to be easily understood. Appellant was found guilty of murder in the second degree, and upon the law of the case as applicable to that degree it is most urgently contended that the fifteenth paragraph of the charge of the court was radically erroneous. It is as follows, viz:

"But, should the jury believe from the evidence that Add. Cannon, Joe Brown and this defendant entered into an agreement to make their escape from jail, and, as part of the common design, that when the deceased should enter the corridor of the jail where Add. Cannon was concealed, and that there was no agreement to do deceased any serious bodily injury that might result in death in the event deceased should resist their attempt to deprive him of his liberty, but Add. Cannon, without the consent, purpose or intent of this defendant to aid by acts or encourage by words or gestures, or in any way participate in the unlawful acts of said Cannon further than to deprive deceased of his liberty, and that said Cannon took the life of the deceased, under such circumstances Cannon would be guilty of murder upon express malice and guilty of murder of the first degree; and, if defendant did not agree to do any act except to deprive

deceased of his liberty, under such circumstances this defendant would be guilty of murder in the second degree," etc.

We are of opinion this instruction was correct, and as favorable, if not more so, to the defendant than he was entitled to under the law and facts. In discussing how far one is responsible for the results of his own and the acts of another acting with him, that learned author Mr. Bishop sums up the matter by saying: "The true view is doubtless as follows: One is responsible for what of wrong flows directly from his corrupt intentions, but not, though intending wrong, for the product of another's independent act. If he set in motion the physical power of another, he is liable for its result. If he contemplated the result he is answerable, though it is produced in a manner he did not contemplate. If he did not contemplate it in kind, yet, if it was the ordinary effect of the cause, he is responsible. If he awoke into action an indiscriminate power, he is responsible. * * * But, if the wrong done was a fresh and independent product of the mind of the doer, the other is not criminal therein merely because when it was done he meant to be a partaker with the doer in a different wrong." (1 Bish. Crim. L., 7 ed., sec. 641.)

Another objection urged to this particular instruction is that it assumes certain important facts as proven. There was no special exception reserved to this instruction. When it is considered, as it should be, in connection with the whole charge, whatever of error there would have been, had a special exception been saved, becomes immaterial and unimportant. We have given the other bills of exception and assignments of error appearing in the record thoughtful consideration, and do not believe any of them present error for which this case should.be reversed. A most foul murder has been committed upon a faithful officer whilst in the discharge of his duties, and it is clearly proven to have been the result and in pursuance of a conspiracy in which appellant admits he was engaged, and which certainly comprehended, according to his confession, the false imprisonment if not the death of the deceased. We see no reason for interfering with the conviction, and the judgment is affirmed.

*Affirmed.*

Opinion delivered January 29, 1887.

[The record in this case was originally filed at the Tyler branch

of the court, but the case was taken under advisement and transferred to Galveston, where this opinion was delivered.]